Michael Zibbon, as Administrator of the Estate of William A. Deyo, Jr., Deceased, Appellant, v Town of Cheektowaga, Respondent.

Michael Zibbon, as Administrator of the Estate of Michele Z. Deyo, Deceased, Appellant, v Town of Cheektowaga, Respondent.

Fourth Department, April 9, 1976

Brown, Kelly, Turner, Hassett & Leach (Roger A. Olson of

counsel), for Michael Zibbon, as administrator of the estate of William Deyo, Jr., deceased, appellant.

*Michaels, Michaels & Wineburg (Lee Michaels* of counsel), for Michael Zibbon, as administrator of the estate of Michele Deyo, deceased, appellant.

*Miles, Cochrane, Grosse & Rossetti (Raymond Miles* of counsel), for respondent.

CARDAMONE, J. Plaintiff appeals from an order of Special Term, Erie County which granted summary judgment to defendant Town of Cheektowaga and dismissed the complaint in two actions for wrongful death. These actions were commenced by William Zibbon in his capacity as the administrator of the estates of both William and Michelle Deyo against the Town of Cheektowaga. The decedents were shot to death by Andrew J. Pieszala, also known as Charles Ventura, on August 18, 1971 at approximately 10:30 P.M. Pieszala was subsequently convicted of the murders. The complaint alleges that the town police were negligent in the performance of their duties, such negligence being responsible for the untimely death of both William and Michelle Deyo.

Special Term granted the town's motion for summary judgment on the ground that the town police owed no duty to the decedents, special or otherwise, and that, therefore, no breach of duty could have occurred to impose liability for negligence on the town.

We agree that there was no special duty for the Cheektowaga Police to perform toward the decedents. It is well settled that a municipality, acting in its governmental capacity for the protection of the general public, cannot be cast in damages for a mere failure to furnish adequate protection to a particular individual to whom it has assumed no special duty *(Bass v City of New York,* 38 AD2d 407, affd 32 NY2d 894; *Riss v City of New York,* 22 NY2d 579; *Motyka v City of Amsterdam,* 15 NY2d 134; *Evers v Westerberg,* 38 AD2d 751; *Tuthill v City of Rochester,* 32 AD2d 873).

A "special duty" has been found to exist to an informer who collaborated with the police in the arrest and prosecution of a criminal *(Schuster v City of New York,* 5 NY2d 75); to a school child at a guard-street crossing where local police assume the burden in the event that a regular crossing guard becomes ill *(Florence v Goldberg,* 48 AD2d 917); and to a person under a court order of protection *(Baker v City of New*

*York,* 25 AD2d 770). Appellant contends that the lack of speculation as to the probability that a serious crime would be committed and the demonstrated capability of Pieszala to carry out the threat imposed a special duty on the town police. The Court of Appeals, however, has refused to impose a special duty on police that would dictate how limited resources should be allocated, "even to those who may be the particular seekers of protection based on specific hazards" *(Riss v City of New York, supra,* p 582).

Thus, although no special duty existed, the town could still be found liable on the principle that "[i]f conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward" *(Moch Co. v Rennselaer Water Co.,* 247 NY 160, 167). One who voluntarily undertakes a duty is responsible for negligence in the performance of such an assumed duty even though the duty did not exist before it was voluntarily assumed *(Bloom v City of New York,* 78 Misc 2d 1077; *Schuster v City of New York, supra,* p 87 [concurring opinion]). The leading text in the tort field, citing Chief Judge CARDOZO's opinion in *Moch,* states that the question is "essentially one of whether the defendant has gone so far in what he has actually done, and has got himself into such a relation with the plaintiff, that he has begun to affect the interests of the plaintiff adversely, as distinguished from merely failing to confer a benefit upon him" (Prosser, Law of Torts [4th ed], p 340; see, *Isereau v Stone,* 207 Misc 941, revd on other grounds 3 AD2d 243; *Jones v County of Herkimer,* 51 Misc 2d 130).

To grant summary judgment it must clearly appear that no material and triable issue of fact is presented. "[I]ssue-finding rather than issue-determination, is the key to the procedure" *(Sillman v Twentieth Century Fox Film Corp.,* 3 NY2d 395, 404). Because summary judgment is the procedural equivalent of a trial, where there is any significant doubt whether there is a material issue of fact or where the material issue of fact is "arguable", summary judgment must be denied *(Phillips v Kantor & Co.,* 31 NY2d 307). Further, the courts are increasingly reluctant to grant summary judgment against a plaintiff in a wrongful death action since the plaintiff is not held to as high a degree of proof as where an injured plaintiff can himself describe the occurrence *(Reilly v New York City Tr.*

*Auth.,* 34 NY2d 764; *Noseworthy v City of New York,* 298 NY 76).

In this context and taking whatever can be implied from the pleadings "by fair and reasonable intendment" *(Dulberg v Mock,* 1 NY2d 54, 56) and assuming, as we must, that all of the allegations are true *(Cohn v Lionel Corp.,* 21 NY2d 559; *Kober v Kober,* 16 NY2d 191, 193), we find that at about 4:30 A.M. on the morning of August 18, 1971 the Cheektowaga Police Department received the following teletype message from the Cayuga County Sheriff's Department: "APB PD Cheektowaga Charles Ventura (with description) wanted for aggravated harrassment believed to be operating a 68-69 Oldsmobile Convertible blue with white top registration unk. Possibly heading to 17 Hillside Dr Cheektowaga NY Res of past girlfriend. Stated that he would kill her. Believed to have shot out window of Holvert res Center Street, Union Springs, NY with shotgun 8-18-71 11-30pm. Subject is known to use shotgun and has threatened to kill any police officer who tries to stop him. Subject is dangerous. Warrant, prints and photos on file Cayuga Co. So. Auburn, NY time 4-00 am."

Ventura, also known as Andrew Pieszala, had for a period of approximately four years threatened, harassed and assaulted Michelle Deyo. A specific instance of violent conduct resulted in Pieszala's conviction for attempting to shoot Michele when he fired shots into her former home in Auburn, New York. Another instance arose in June, 1970 when Pieszala was charged with possession of a dangerous weapon and drugs as the result of his pointing a pistol at a girl in Cheektowaga whom he had mistaken for Michelle Deyo. He pleaded guilty to a reduced charge; however, at the sentencing he became agitated and threatened the Town Justice who thereupon committed him for a mental examination. Pieszala was hospitalized at Meyer Memorial Hospital and was diagnosed as a psychotic depressive, dangerous to himself and to other people. While serving his sentence, Pieszala was voluntarily committed to Matteawan for the remainder of his term.

On August 17, 1971, one day before the murder of William and Michelle Deyo, Pieszala was in Union Springs, New York and had threatened another woman by the name of Corrinne Holvert. He shot out a window in her residence and threatened to "take care of a couple in Buffalo". Miss Holvert contacted the local police in Cayuga County, who contacted the Cheektowaga Police Department at approximately 4:30

A.M. on August 18, 1971. The "All Points Bulletin" received by the police referred to the "shot out window". Thus, the police had reason to believe a dangerous, highly agitated criminal, armed and intending to murder Michelle Deyo was presently on his way to her residence for that purpose. As a result of the information they received, the Cheektowaga Police called and warned William Deyo of these facts at about 5:00 A.M. and advised him to stay away from the windows, not to answer the door, to keep the lights out, and, further, that if he saw or heard anything to call the police who would have cars in the area. He told Deyo that the police would keep a routine check on the house.[1]

Confirmation of the Deyo's belief that they were being afforded some degree of police protection is found in the testimony of William Zibbon who spoke to his daughter, Michelle Deyo, at 5:50 A.M. and asked her to spend the day at his house. Michelle replied that she was safer at home and that "there are police cars all over the place". Further evidence that the Deyos relied upon the police for some measure of protection is found in the fact that an unloaded shotgun was discovered in the Deyo's closet and from the state of undress that the victims were in at the time of the shooting at 10:30 P.M.

In fact, the action taken by the police was as follows: The police officer on patrol when the teletype message was received checked the Hillwood residence three or four times until the end of his shift at 8:00 A.M. When the midnight to 8:00 A.M. shift went off-duty, they alerted the day shift and because of the gravity of the situation posted a "blotter bulletin", but omitted the fact that the reason for Pieszala's coming to the area was "to kill" Michelle Deyo. Five officers and two vehicles were on duty from 4:00 P.M. to midnight on August 18, 1971. The Detective Captain brought the teletype message to these officers' attention and ordered that surveillance or a "close check" be kept on the Hillwood residence. Neither a stakeout nor constant surveillance was ordered. No further contact was made with William or Michelle Deyo.

---

1. A Sergeant of the Cheektowaga Police Department testified at an examination before trial that in his conversation with William Deyo he suggested that the Deyos leave their home and that Deyo at first objected but later agreed. However, we note that any conversation by a police officer with the decedent is not admissible under the Dead Man's Statute (CPLR 4519) and may be used to defeat a motion for summary judgment, but not in support thereof (*Phillips v Kantor & Co.*, 31 NY2d 307; *Moyer v Briggs*, 47 AD2d 64).

During the time of the homicide three of the five officers on duty were at the Buffalo Police Headquarters on an unrelated matter. The remaining two officers stated that they had checked the area immediately after reporting for duty and toured the area on several occasions. They claimed that when they returned to the area at approximately 10:30 P.M., they saw the automobile described in the teletype, checked it and removed the ignition keys. At that time, they received a radio message that a neighbor had heard shots on Hillwood. Taking this testimony at face value, there was a suspension of the "close check" ordered by the Detective Captain of the Deyo residence for approximately two hours prior to the fatal shooting.

We find that Special Term erred in invading the jury's province by ruling as a matter of law that "the Police Department of the Town of Cheektowaga did not create a greater danger than that which existed before the threats. There was no act of omission which because of the Police Department's prior conduct affirmatively caused an injury". On the contrary, we conclude that the plaintiff's allegation of facts "arguably" demonstrates, if proven, that the town police affirmatively undertook a duty to protect the Deyos, the Deyos relied upon such assurances of protection and, thereafter, the police virtually withdrew such protection without notification to the intended victims. Such actions by the town police deprived the Deyos of the opportunity to take necessary steps to protect themselves and subsequently increased the danger to the decedents. To hold as a matter of law that in the absence of a special relationship between the police department of a municipality and a member of the general public, the police department may never be cast in damages even when it assumed a duty by affirmative action and negligently performed such duty, is contrary to sound legal analysis, relevant policy considerations and judicial precedent.

Since there are triable issues of fact summary judgment should be denied and appellant afforded his day in court to prove that the police department assumed a duty by action, and then failed to perform such duty in a careful and prudent manner, thereby adversely affecting the interests of William and Michelle Deyo. The fact that the defendant municipality's contentions might well prevail at the trial is not a sufficient ground to dismiss a complaint at the pleading stage if, under any view of the facts, plaintiff has stated a cause of action

*(Cooper v Morin,* 50 AD2d 32, 37). We conclude that in this case the complaint does state a valid claim for relief.

The order dismissing the complaint should be reversed and the motion for summary judgment should be denied.

SIMONS, J. (dissenting). On August 18, 1971 the Police Department of the Town of Cheektowaga had knowledge that Andrew Pieszala intended to seriously harm plaintiff's intestate, Michelle Deyo. Later that day Pieszala killed Michelle Deyo and her husband, William, and it is plaintiff's contention that the town is liable in negligence for the damages resulting from the failure of the police to prevent the homicides.

It is well established in New York that the duty to furnish police protection runs to the public generally and not to its individual members. In the absence of some special duty owed to plaintiff, an individual may not recover civil damages resulting from the failure of a municipality to supply adequate police or fire protection *(Riss v City of New York,* 22 NY2d 579; *Motyka v City of Amsterdam,* 15 NY2d 134; *Murrain v Wilson Line,* 270 App Div 372, affd 296 NY 845; cf. *Schuster v City of New York,* 5 NY2d 75; and see generally 18 McQuillin, Municipal Corporations [3d ed], § 53.51). The rule is based upon the sound principle that courts should not judge the acts of a co-ordinate branch of government providing protection from external hazards, since the services provided are limited by the resources available and by a considered legislative-executive decision on how those resources should be allocated for the benefit of the public generally (see *Riss v City of New York, supra; Motyka v City of Amsterdam, supra).*

Recognizing the general rule and acknowledging that defendant owed no special duty to plaintiff's intestate in this case, the majority rely upon the legal principle that one who assumes to act, even though he acts gratuitously, is bound to act carefully *(O'Grady v City of Fulton,* 4 NY2d 717; *Glanzer v Sheperd,* 233 NY 236, 239).

Perhaps it is answer enough to that argument that no case similar to the one before us is cited in which this rule has been used as the sole basis for recovery[2] —and there is good

2. In *Schuster v City of New York (supra),* the assumption of duty rule is discussed in both opinions adopted by the majority, but the case is commonly cited as standing for the special duty exception to the general rule. It is questionable whether the assumption of duty doctrine, standing alone, may ever impose liability upon a municipality for inadequate police protection when only partial protection has been offered.

reason why this is so. The application of the rule in cases alleging inadequate police protection opens an avenue of broad liability against municipalities, for once it is found that the police acted, regardless of the nature of the acts, liability follows as a matter of course. In practical effect, any action becomes a waiver of nonliability permitting Judge and jury to review discretionary decisions involving the methods and procedures employed by the police. That is the difficulty in this case. The majority have used routine police activities to find that the police assumed a duty to provide individual protection to the Deyos.

Under the assumption of duty rule, the town may be said to have created a duty to the Deyos under two hypotheses: (1) if the police, by their acts, increased the potential for harm to the Deyos from Pieszala, or (2) if the police misled the Deyos into believing either (a) that the danger to them was removed, or (b) that the police induced the Deyos to rely solely upon the police protection, thereby foregoing help from other sources (see Restatement, Torts, 2d, § 323; Prosser, Torts [4th ed], pp 343-347).

Assume that the police undertook to provide protection to the victims and assume further, as is alleged, that subsequently the protection was withdrawn. That conduct, standing alone, would not result in liability under the assumption of duty doctrine (see *Messineo v City of Amsterdam,* 17 NY2d 523). The alleged withdrawal of this surveillance would not result in liability because it did not aggravate the danger, nor did it enlarge or prolong the risk to the Deyos. By way of illustration, if Pieszala had mistakenly killed a neighbor rather than the Deyos, there would be no recovery on an assumption of duty theory because the risk to the victim before the duty was undertaken and after it was abandoned was precisely the same (Restatement, Torts, 2d, § 323, Comment *c).* But even more to the point, the surveillance in this case was little more than a step-up in routine police patrolling activities, hardly the type of undertaking upon which a duty of personal protection can be predicated.

If plaintiff is entitled to recover, recovery must be based upon the second hypotheses, the theory that the police somehow assumed a duty not otherwise existing because of their warning to the Deyos and the Deyos' reliance upon that warning.

There are strong policy reasons why we should be slow to

inhibit such necessary police conduct by imposing liability upon a municipality predicated upon a police warning of danger to an individual but we should not do so here, for the police warning to the victims was accurate and complete (cf. *Schuster v City of New York, supra,* pp 79, 88, in which the police falsely stated the facts), and the police gave no assurance of greater protection than that which was actually offered to them. The Deyos were told to protect themselves by specific instructions to stay away from the windows, not to answer the door, to keep the lights out, and to call the police if they heard anything. They were also advised that the police would maintain cars in the area. But the police did not represent that the protection offered was sufficient to justify the Deyos placing complete reliance upon it. Regardless of what the Deyos believed, the extent of the representations made by the police here cannot serve to impose liability upon the town.

The judgment should be affirmed and the complaints dismissed.

MARSH, P.J., and GOLDMAN, J., concur with CARDAMONE, J.; SIMONS and MAHONEY, JJ., dissent and vote to affirm the order in an opinion by SIMONS, J.

Order reversed with costs and motion for summary judgment denied.

